I don't know if I pronounced that correctly, but you can correct me when you stand up, Mr. Barron. Case number 162709, and that is an appeal from a decision in the Northern District of New York on a motion for preliminary injunction. It's obvious to me your clients name these companies totally confuses. Yes, it's terrible. QIAGEN is how you say it. QIAGEN. Thank you. How much time do you want for rebuttal? Three minutes. Three minutes. Okay. May it please the Court, my name is Rob Barron, I represent QIAGEN as the appellant. In this case where the lower court, in a preliminary injunction motion, granted it, which is, as this Court knows, an extremely rare and obviously a very powerful and damaging remedy. It's also one that we defer to the District Court on. It's a discretionary determination, correct? Abusive discretion is the standard, but the abusive discretion exists when there are legal errors. For example, if a preliminary injunction is issued because the District Court judge relied on extrinsic evidence, ignoring intrinsic evidence, that's clear error, that's the Gutman case. So here— But we don't have that here. I think we do. Let me jump—so we obviously have a couple errors that we want to focus on. There's the enablement issues, there's the obviousness, and then obviously irreparable harm. Let me start with enablement. The claim— Can I start with estoppel, though? I want to start with the estoppel question. Sure. My first question is, you didn't dispute either below or here that you are in privity with the party that brought the IPR. Isn't that right? There was no litigation about that one way or the other. We did not—but we did not take a position below. So we have not— Well, Illumina argued— Let me say two things. I'm sorry, Your Honor. Illumina argued you were in privity. You didn't respond at all. Here, they argued you're in privity, and you didn't respond at all. Do you concede that there's privity? I mean, this doesn't even seem to be a close call. We don't concede— There's a lot of other elements of estoppel, but the privity thing, I want to just get off the table. Yeah, and I appreciate that. We don't concede there's privity, but for purpose of this argument, there's nothing that we did. There's no case that we presented that depends on privity. Okay. So we can assume privity? You can assume—that is not an issue that changes the result of the preliminary injunction. We're not conceding it for this case. It's just that it's preliminary stages, but that has no impact on this. Okay. Then let's move to—you were going to start on enablement. Yes, Your Honor. Okay. On pages 33 to 37 of the opening brief, you claim that the disputed claims are not enabled because they permit the incorporation of nucleosides. I'm saying that, right? Yes. You're hearing me. Nucleosides in nucleic acids, which is supposedly impossible. However, one of your experts, Mr. Broncho, has testified that it was, quote, generally known that, quote, nucleosides could be used in labeling methods such as those claimed in the 537 patent. That's at 5492. How do you reconcile your argument with your expert's testimony? So, I think that we need to put that in context, and I appreciate that line. That line comes from a three-and-a-half-year-old declaration from a related IPR on obviousness. It's a 110-paragraph declaration where he has one paragraph where he says, tracking the language, that labeling—a person with skill in the art would know labeling methods for nucleosides and for nucleotides that could be—such as those in the 537. He was never asked the question, could a nucleoside be incorporated correctly? Never. Could a nucleoside be incorporated into— That sounds like a lot like an admission. It's not—first of all, it was not—it has nothing to do with the issue of enablement. He is—this is on an IPR where the issue is obviousness. And if you want to talk about admissions, I think it's important to realize that in that same case—so he was never asked the question, does a nucleoside—let me be clear here because he also says three paragraphs before that on the page before on the record that a nucleoside does not have a phosphate. He makes that clear. And there's no question that that's how the patent defines the difference, and there's no question between the experts that a phosphate is what you need for this method. This method doesn't work without phosphates. He was never asked that question because enablement was never on the table and he never got the question. Now, in that—in an IPR, their expert was actually asked a specific question. Would a nucleoside—could a nucleoside be incorporated? His answer was no, it could not be. It cannot be incorporated by enzymatic means or even chemical means. So when their expert was asked a direct question, their expert—and that's at 1753. Well, what about the board's conclusion with respect to Claim 4, which—I mean, the court's conclusion, where the court specifically found that Claim 4 doesn't require nucleosides? I think it's the same error. I think there's a theme here, which is that words matter when you draft a patent, you submit it, and whenever they get in the way, they're glossed over in this opinion and in this case. Here, it says, as we discussed, three times in Claim 1, nucleoside or nucleotide, nucleoside or nucleotide. And then it says in Claim 4, the method of Claim 1 where the nucleotide is a deoxyribonucleotide triphosphate. So it doesn't say where the nucleotide and the nucleoside are. It just says the nucleotide. So it is a further refinement and limitation on the alternative nucleotide. The independent claim provides two alternative molecules, nucleotide and nucleoside. Claim 4 is dependent on the nucleotide only. Let's move over to the two-prime limitation. Yes, Your Honor. You contend that two-prime, in your open brief, doesn't enable a poseidon to practice the experimentation. And to support that argument, you cite Mr. Metzger at 1104, 1105. Mr. Metzger doesn't say how much experimentation would be necessary or why it would be undue, and he doesn't identify what guidance is needed. How does that testimony at 1104 and 1105 support your argument? So first of all, in the two-prime argument, what he says is, in effect, there's no guidance at all. And first of all, I think it's important to realize that for most of these, you have to look at it as a claim as a whole. So we're talking about the fact that we're trying to incorporate or attach a class of protecting groups that are 2,000. And now we're talking about the utility of this protecting group is to stop a linking process that goes through the three-prime, which is just a reference to a location on the sugar, which is kind of the torso of the nucleotide issue. So that's the process you're trying to stop. All of the art talks about putting a protecting group on the three-prime. All of the disclosure in the patent talks about putting a protecting group—well, there's almost no—ironically, we'll get there. For this, given that the protecting group is the invention here, there's almost no disclosure in the specification about protecting groups at all, other than a suitable protecting group would be known to a person of skill in the art. We'll get to that. But— You better get to your irreparable point, too. Okay. But the two-prime is on a different location. And the only guidance they have is that it should be big, basically, or of a sufficient charge. One sentence with no guidance, no examples. But to incorporate, the person of skill in the art is also being told the protecting group should be small enough because it has to be grabbed by an enzyme called polymerase to be put into the prior nucleotide. So there's conflicting evidence. And to take—whether it's the group of 2,000 different azeta groups and figure out how to put that on the two-prime, or one, azetamethyl, which is known for its being small, which is the opposite of what it would need to be for the two-prime. That's an enablement problem. Moreover, our expert does say in his testimony that there's nothing in the patent that talks—there's guidance about DNA polymerase. There's no guidance about RNA polymerase. So if it's on the two-prime, that means it's an RNA molecule as opposed to a DNA molecule by definition. There's no dispute about that. And there's no guidance at all about what polymerase would work with an RNA in the specification. So moving on to irreparable harm, there's a fact that you conceded that you infringed. I mean, that's not a finding. That's a concession on your part. How heavily, if any, should that weigh in looking at all of the eBay—the four eBay factors? Well, two things. First, we did not mount a non-infringement defense, but to say that we conceded it or stipulated to it is, I think, overextending. But we don't have an infringement defense before the court. I think that you put your finger on something that seemed to be going on perhaps with the lower court that was an eBay violation, that there was this notion—I mean, the eBay stands for the principle that likelihood of success doesn't mean irreparable injury anymore. And so we thought, and we continue to believe, that this is a patent that has a lot of holes with it. This is a patent that has no enablement. This is a patent where the claimed invention, the special inventive step, is in a Zito, but it's not mentioned in the specification. The only thing they say is, suitable protecting groups would be known by a person of skill and the art, and you should look to Greenwoods, which is one of our references. So you can lose at the fact of dealing with the likelihood of success, but you can also lose at irreparable harm. I don't want to confuse the two. I agree, Your Honor. Okay. So with respect to that you're an infringing entity, in moving forward and looking at the nascent market, would you agree? No, I don't agree with that, Your Honor. Okay. So I think that if we're going to move to irreparable injury, there were—when the motion was filed— But your entry into the market was nascent. We were a new entry. Yes, we were a new entry. Right. I think that's— I apologize. —obviously what Judge Radin was talking about. I apologize if I misunderstood the judge, but I do think that the basis for my misunderstanding was in part because I think that's what Judge Alsop found without any real testimony. No, he found that you were new into the market and that you had a new pricing structure that could impact the market, and so therefore you could dramatically alter the market. And to add to that, you're infringing. You loon a pen. You're new to the market. You end up bringing a new distribution and pricing system, and you're infringing. And to add to that, Mr. Arnold, your expert, agreed that the GeneReader's performance is poor relative to Illumina's products. So these are—I'd like to address each of these in turn, if I can remember them all. First, on the issue of, I guess, irreparable injury, Judge O'Malley, and your point, I think that what—they started out by saying it's going to—we're going to lose sales and we're going to have a discounted price. There was no evidence of that. So the judge talked about a crucial inflection point, something special about the market now. But the facts were that this market existed for a long time, that Illumina had been identifying this as an important market for a long time. And obviously, also, even if we're not mounting a non-infringement defense, we're mounting a very vigorous invalidity defense. And that's the concern. I mean, one of the reasons why these courts are here are to prevent invalid, improper patents that shouldn't have been granted from directly affecting commerce. I mean, you have an important industry. You have, in the appellee, a company that has dominated it for years. It's 70 percent market. There's been one other participant in the market at 25, 30 percent market share. We try to come in. You've seen the confidential numbers in the briefs about the very slow start. I certainly appreciate adding vigor to the market and not stifling innovation by way of issuing preliminary injunctions. But my concern here is that your entry into the market at the outset was from an infringing point of view. You haven't mounted a defense. And I don't know where, but it sticks in my mind that there's a concession. But even putting that aside, you're not fighting the fact that yours is an infringing product. That being the case, then shouldn't we put on the other shoe also and look at allowing an entity in your status with the circumstances that you have to enter into a market with a different distribution system, severely depressed pricing, and then to do it from a perspective of infringing? Why should we allow or why should the law permit this entity? Why should we view this as being good for competition, innovation in the market? Well, described that way, it shouldn't be. But that's not what we think the facts are here. Obviously, we think it's an invalid patent. It is a defense, and that's a real one. And we just need to assert a substantial question at this stage. We haven't had discovery, but we think that we have various, very substantial enablement and obviousness issues. But beyond that, on the irreparable injury, this disruptive pricing, the record is clear. Illumina admitted, and the record admitted, and it's in the record, that this has existed for years. There's nothing new about this. Illumina knew that this is what customers like. They've done it themselves. The competitor, the second in the market, Thermo Fisher, has done this for years. That's in the record. There's nothing new about it to the extent that our sequencer is actually more expensive than many of their sequencers because it's different. Ours is a complete workflow. The reason why it's even attractive is it's a different system. This is DNA sequencing, so it takes it from the sample. It prepares the sample, analyzes it, and then it does sequencing and then gives you analysis through bioinformatics. The Illumina sequencers are mostly just kind of a middle step there. So that was the appeal of this system. But to the extent that you're referring to, there was a period of try and buy where we were offering them for a lower price or even say you pay if you like it. If we hadn't been enjoined and they liked it, then they would have paid us. I mean we got enjoined. That's very typical. You're a new market entrant, and you say, well, try it for a little bit and see what you like, and if you don't like it, you'll give it back. But if you do, then you'll pay for it, obviously. We're just giving them away. That's not a very good business. So that was never the business model, trust me. So I think that that's a very important point is that this disruptive pricing— That's a lawyer argument, but I'll trust you on that. On which part? No, I want to— That you're not giving it away for free. That's the business model. You're right, Your Honor, but the record— to come up with non-infringing methods and couldn't and decided to just go ahead and infringe. Well, I wouldn't characterize it that way. And in fact, although not part of— although I think actually Mr. Reines inserted into the record, since the injunction there's actually been an announcement that there's a design around. So it's not like this was impossible. The company—and I don't think the testimony was that. I think the testimony was— That's how I read it. Well, because it was a snippet. I think it's when the case was filed, you started looking to alternatives. Do you have one? It says, not at this time. That was August for a case filed in June. September is the announcement of the injunction. And in November, we say we have a design around it. This is one little— Why does this matter, then? Sorry? Why does this matter? An injunction seeks to stop irreparable harm. If the injunction has succeeded in preventing the existing accused product from entering the marketplace, and then you have quickly designed around it, then shouldn't we all just go forward? It's a good question. It's an important question. I'm glad it's come up now. The reason why is, one, the ruling was wrong, and it's restrained our own economic liberty to make a choice and enter into the market. I mean, the fact is we don't think there was a proof of irreparable injury. But moreover, we haven't actually launched it yet. We've given it to a couple of customers. I think the announcement is that it should be launched commercially in the United States by the end of the first quarter. So you're looking at seven or eight months of time out of the market. So the preliminary injunction has chilled yourselves. Yeah. I mean, there's a reason why the court made Illumina Post a bond and a substantial bond. I mean, it's damaging. So you're really hoping that we rule by the end of the first quarter? I'm hoping that you rule in our favor. Okay. We're way over time, so we'll give you two minutes for rebuttal. Thank you. Mr. Reines will give you four extra minutes if you need it. Thank you, Your Honor. Let me address the question of where we are procedurally and this issue of going forward and how hard they are. One thing that's completely absent from their appeal brief, opening reply, is any complaint of damage as a result of the preliminary injunction holding the status quo. It's just a waived issue. We said it was waived in our opposition brief. In their reply, they were meticulous about never saying that it was harmed. Why? Because they're not only saying that they have a replacement chemistry. They're saying it's better, and they can't tell the markets, the financial markets, that they've got a better thing and that this spurred them to innovation, the finding that they were infringing and so forth. And then, on the other hand, come to the court and argue this is a grievous injury or any injury. So his opening line was that this is a damaging injunction. He's not entitled to make that argument procedurally. With all sincerity, I think you have a problem with damages too.  You're fearing a competitor that's coming in and offering the product at half the price. You've been a player in the market. You dominate it. Okay, let me address— And I don't see any evidence of price erosion, loss of market share, not anything that's significant. Let me address that. So this is the question of what the market is, and there's been some conflation of that. Your questions, as always, are fair, but let me—I think there's a complication. Well, that's your reputational argument, isn't it? Well, there's the reputational thing, but I think there's a market. So when the quotations come to you about quantity of the market that Illumina has and its dominance and all that, that's referring to DNA sequencing broadly. A little page of history is important here, which is—and it's on the record— is that typically they were sold to these genome centers that buy hundreds of DNA sequencers or research universities. That's who the market is for DNA sequencers historically. This panel, I know, hears a lot of these type of cases. This is what's going on. What's happened in the last few years, and you've heard about it and you'll hear more, is that people are learning how to apply DNA sequencing to personalized medical care, which means it's a completely different market. It's going to the Cleveland Clinic or Reed Hospital and saying, you know, you should have your little appliance that you can do sequencing in your hospital. Why should we stifle the development of that market by sustaining an injunction on a new entrant into the marketplace? Well, I mean, I don't think there's any evidence you are, and I don't think that they're entitled to argue it. Well, it's not that we are. I mean, you are. You're the one that's supposed to present the evidence why we should have the injunction. Right. The court below found that the bounds of the harms favored us. It's not appealed. But, Your Honor, let me make— And they didn't argue that there was somehow some public interest in having more opportunities. They didn't. He found the public—so let me just explain this market. So their argument isn't that we dominate this market. Their argument is there's others in the market, so why are we complaining? Their argument is there's the Ion Torrent. There's these other systems. Why are they picking on us? And the reason we're picking on us is that industry analysts have found their system to be imitative. That's the word that was used, not by us, by a third party, and it's not been contested. Okay, so we're going to these hospitals. They own the hospital labs as customers. That's their business. They're doing something else and selling them things, how you get blood, whatever. So they already have the relationships at all the hospitals. We don't. We're at a disadvantage market-wise from them. They come in to their existing customers and say, We've got a great new little box that you can do DNA sequencing. And here it is. We'll give it to you. Disruptive? How is that not disruptive? We'll give it to you if you like it. You keep it if you don't. You don't. He said there's no evidence of discounting. A1884, 50% discounting. We'll give it to you on the cheap. Now the problem is that these are not the regular uses of— That's a different market model. That's a completely different market. It's an emerging market. I don't know why my friend, who's quite a good lawyer, is arguing that this isn't an emerging new market. You open the New York Times and you know that personalized medicine and doing these— If we're faced with a new market with emerging technology, shouldn't we be more careful with injunctions at that point? You should be more careful to protect the property rights owner in the emerging markets. That's what the case law says. Well, look at it differently. Shouldn't we be more careful with sustaining preliminary injunctions or any permanent injunctions with the view that it may stifle the development of that market? Who's to say that the entry of this particular company into this new marketplace won't expand and sustain competitiveness as well as maybe drive other innovation? That argument applies to any injunction, and we've met the factors for an injunction. I don't think the district court was careful, extremely experienced, extremely bright. Does it apply in any different way by the fact that this is an emerging market? The established law, Your Honor, is that it's more important and more likely to be irreparable harm in an emerging market. That's just the law. Did I really hear you say that, Mr. Rance, that the district court is extremely bright? Because I'm going to give Judge Alsop a call. Well, he is. It's a matter of his opinion, but it's my opinion. I didn't say it was opinion. I said it's a given. Oh, it's a given. I think even your opponent will give you that Judge Alsop is very bright. Well, thank you. He's shaking his head yes, for the record. But Your Honor, the facts of this situation, I understand your concern about the importance of this court in keeping the eye on the ball of innovation. I get it. They have an imitative product. They knew they were infringing. They knew it. They tried to change the chemistry from 2012 to 2015. They had a prior product that they abandoned that was infringing. They're recidivists. They come back. They've been changing the chemical formulations. They say that publicly. Then they have to come to market because of internal pressures, apparently, and they go forward with this as they're losing the IPR before this court, and they took their best crack at invalidity. That's outrageous, but let's hold aside. What about innovation? First of all, their argument is that there are others in the market. Why are you picking on us? So it's not like we're dominant in that market. We're getting established. But more to the point. I think that was in response to my statement about how dominant you are in the market. But we're not dominant in this market, and their argument isn't that we're dominant in this. Right, and this is not a situation, as I understand it, where they made the argument that it's a two-person market and that in the absence of this competition, that the health care system in the United States is going to be at a loss. It's the opposite. They're saying why are you picking on us? There's others. You can't show harm. Where's the record, Evans, that we can look at establishing that this is a new? I know there was some discussion about these machines. It's the Van Own Declaration, who's the senior executive of our company, and he wrote a careful declaration that relies on documentation from public literature and, importantly, governmental reports on the emergence of personalized medicine, and that's at A, 1052 through 1070. I remember looking at it and thinking, well, it's almost like a mini factory, in effect. Yeah, I mean it's just taking the idea of sequencing and making it not the province of huge, massive labs that are specialized, but bringing it to the hospital and the doctor's office. But I do want to say on this issue of innovation, they have come out and said they have a superior chemistry that's their own. That's the patent system working. Don't be an imitator. Do your own thing. I'm sure the CEO said, what's happening? We spent a lot of money on this. We need to have a crash program, and we've got to get it out now. And they get it out, and they announce it to the financial markets and everyone. They assure them that they've got a better chemistry now, so that we made their product better if you accept their comments at face value. So innovation is fine. Do you want to address any of the validity arguments? I'm very happy to. I guess starting with the nucleosides argument, there's the admission that Judge Wallach pointed out, which is point blank, and it's just there. There's the fact that their own expert in his own patent application used the same nucleotide or nucleoside formulation in indistinguishable circumstances. Don't listen to anything that's said contrary to that. It's indistinguishable circumstances. Now the argument is, what they put their whole point is, that in our patent we somehow disclaim that our nucleoside could ever be incorporated because it can never be associated with phosphorus. That makes no sense. The patent says nucleotide or nucleoside, and then it says when we talk about nucleotide, we're also talking about nucleoside. Then it uses both terms with a hyphen to make clear that they're both applicable. Then it says nucleosides can be incorporated, and perhaps most of all what they rely on is the definition, essentially in own lexicographer form of it. I don't think they've styled it that way, tactical or other reasons. And that says nucleoside includes nucleoside analogs which have side chains or other reactive groups that let it attach to other molecules. And there's just no reason to say why that wouldn't include the phosphates that are part of how the system describes that it's worked. On top of that, there are alternatives where you wouldn't necessarily use the phosphates. There's an AZT process which is A1840 and 41, and then there's chemical. So there's multiple others. But even if that was all untrue, and it's not, and even the patent's begging you to say that it includes nucleosides and you don't believe it, for whatever reason, even though it's generally accepted in the art of fact-finding, they don't deny. In the art, it's generally accepted nucleosides can be incorporated. They don't deny that. Their argument is this lexicographer thing. They still have to win on their Claim 4 argument, which to me, Claim 4 says where the nucleotide that's used in the method is, and then it states specifically that it's a deoxyribonucleotide. And the argument is, well, that claim covers the specific use of deoxyribonucleotide trisphosphate and then all nucleosides. Could you imagine if I came before this court and said that that dependent claim to a specific nucleotide covered all nucleosides? That would be a tough day. So they have to win both those arguments, and they have to have a finding that the district court got all that wrong as a matter of its discretionary exercise in view of all the other issues. I think at the end of the day, what I want to say is, when they brought their motion to expedite this appeal, they represented to the court that the injunction would be long-term damage. They said some things which I think, certainly in hindsight, were irresponsible. They said it would be long-term damage, that it would have ramifications forever and all this. They got the expedited appeal, and right after that announced that they have this better chemistry. And then the appeal doesn't mention any harm to them whatsoever because they're being meticulous about not saying any harm for all host of reasons. That's a bit of an abuse of the appellate process. But hold that aside for a second. My point about making this is, there's an injunction right now that's not hurting anyone. They've got their plan. They're committed to it. They say that it's better. They can't possibly go back to the market and say, now we're going to go back because we got a remand. It holds the statute. Can they say by the end of the quarter? Well, yes. That was the representation. They said that they don't claim any harm from the result of this injunction. It holds the status quo. If there are any questions regarding whether they can thread the needle on obviousness through their failures before or somehow one of these enablement claims becomes something, then that can be reviewed by this court on a full record at the end of the time. In a normal way, you do it. They don't have an allegation in this appeal that maintaining the status quo is harmful to them. So what would even be the point? Other than they could score some PR points. And certainly Judge Ossoff's careful opinions don't deserve that. Well, at fairness, if the injunction never should have been entered, I'm sure there's a bond that's pending, and they would be able to show that there was some damage from the failure to be in the market sooner. They're the ones that are arguing that they barely made any inroads into the market. So I think Judge Ossoff covers that in his stay request. It's like, wait, you're the one saying you're barely making any inroads into the market. How can you now say that? So that's the problem with that. Look, I'm not shying away from the record and defending each of these points now. I'm just saying in terms of the quality of the presentation being made on the merits, it's not good. And Judge Ossoff's findings that there wasn't a likelihood and they were weak showings is dead on. But if it were ever to mature to something better, there'd be a record. They'd be able to prove it. On this record where they don't even complain damage or challenge balance of harms or challenge the public interest – by the way, the public interest point – and then I'll sit down. The public interest point was that we presented and Judge Ossoff accepted because it's a good one is they're going to these smaller institutions, selling them essentially their first DNA sequencer. I don't know every time, but it's new. And then selling them something that they acknowledge works relatively poorly that looks like ours in an imitative perspective. And what happens if there's ultimately an injunction or there's ultimately a file of infringement when these smaller entities are using scarce funds? And they don't challenge that finding on this appeal. Thank you very much. Thank you. Two minutes. Thank you, Your Honor. There's a lot there that I want to try to correct. First, we absolutely do refute the performance issue. All we said was it's not as robust in kind of statistics of 0 to 60 in four-second kind of statistics for sequencing. Yeah, but it's right that you don't challenge the public interest finding on appeal. The public interest we didn't bother with on appeal. All right, so whether you bothered with it or not, it's not before us, right? The performance issue, though, was cited for a recordable injury that had justified the injunction, and it has no basis in there. There was no evidence of that. Mr. Ryan has tried to get an executive to admit that your machine doesn't work right. He said, no, it works exactly as we're telling everyone it will. It doesn't need to do all the things that you do. It does what the clinical labs need. And, by the way, the notion that this is an emerging market is wrong. In 2012, they identified this as an important market, and they got FDA approval so they could go to this market. So it's not a new market. It's growing, sure, but everything grows, and we're out of it. Right now, the harm is that there are going to be that the existing market is mature, but it stands at the threshold of this emerging market, the new. With CRISPR coming on and all this other type of DNA technology, these products are going to have a radical new use. But if you're going to enjoin someone, put them out of the market with a trial just a year away and very quantifiable damages, put an expert on. Put an economic, you know. But you specifically have not appealed the balance of harms. So there's no issue before us about potential harm to your client. You haven't appealed balance of harms. You haven't appealed public interest. You've only appealed irreparable harm. In fact, it was notable that the reply doesn't even address it. We appeal the judgment or the injunction. We did not get into argument on those two factors. Right, so we have to assume that those factors are fine. But what I'm saying is – and that is the balance of harm issue about our – that's all it is. It doesn't take away from the issue of irreparable harm or likelihood of success. And he says that's what should happen at the end of the process. The end of the process should be – it's a pretty extraordinary remedy. Let us try the case. Let us have the full record. And then if we're right on a full record, then we can talk. You started your two minutes by saying that you don't concede the quality argument on the alleged poor performance of the gene reader. But I'm looking at 1873 of the record where your expert says we feel we're significantly behind on many of those and so on. And it sure looks to me like he is conceding. No, so what – the question was about statistics. And what Kyogen has said, like how many – Well, the question was does Kyogen anticipate being able to get the chemistry worked out so as to have serious improvement in read length, accuracy, and output? So for – and the comment was on read length. So Kyogen devised a closed system. Illumina's system is more – has a longer read length. So you can just put a sample in and it will tell you the whole genome. Ours doesn't have that power. So we say, look, here's the cancer gene of interest. Here's a panel with the cancer genes of interest. You don't need that power for what we're doing. And what our attraction is, it's a whole workflow that's easier to use and has everything in one. So we don't say it's not going to work. I think that's very important. All right, you're way over your time. Thank you. You got that answer out. Okay. All right. The court is adjourned. All rise. The honorable court is adjourned until tomorrow morning. It's at o'clock a.m.